Elmer HARPER, Jr.,
Petitioner–Appellant,

v.

Walter R. KELLY, Superintendent,
Attica Correctional Facility,
Respondent–Appellee.

No. 1160, Docket 89–2364.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1990.

Decided Oct. 10, 1990.

David A. Lewis, New York City (The Legal Aid Soc., Federal Defender Services Appeal Unit), for petitioner-appellant.

Stanley R. Kaplan, Bronx, N.Y. (Robert T. Johnson, Dist. Atty. of Bronx County, Billie Manning, Asst. Dist. Atty., of counsel), for respondent-appellee.

Before OAKES, Chief Judge, PRATT, Circuit Judge, and LEVAL, District Judge.[1]

OAKES, Chief Judge:

This habeas corpus action calls on us to consider the extent to which a trial court may restrict a defendant's cross-examination of crucial eyewitness identification testimony. Specifically, we are faced with a state trial court's evidentiary ruling that precluded inquiry into a victim's emotional state during an armed robbery, when the victim made observations that formed the basis of his identification of the defendant. Finding that the court infringed upon the defendant's Sixth Amendment right to confront his accusers by disallowing this significant line of inquiry and that the error was not harmless, we reverse the dismissal of the habeas corpus petition, 704 F.Supp. 375, and remand with instructions to grant the writ conditionally.

## BACKGROUND

At approximately 8 P.M. on May 9, 1984, Jack Small, the service manager of the Sears Auto Center on Fordham Road in the Bronx, stuffed the day's cash receipts of around $4,000 into his vest pocket and, accompanied by security supervisor Frank Lester, walked across the parking lot to drop the money off at the main store. It was dusk and the lights in the parking lot were not yet on. As Small and Lester crossed the parking lot, a man wearing a black rain hat and dark sunglasses sur-

prised them from behind a van and demanded that Small hand over the vest. After Lester told Small not to cooperate, the man pulled a gun from his waist, put it to Small's stomach, repeated his demand and threatened to "blow [Small's] fuckin' head off." Small then handed over the vest, and the man left. The entire incident lasted about 30 seconds.

Three weeks after the robbery, on May 29, 1984, petitioner Elmer Harper, Jr. was arrested for shoplifting at a Sears department store and taken to the store's security office, where he was detained for an hour until the police arrived. Lester, who also happened to be present in the security office, was able to see Harper and hear him speak. Nonetheless, Lester did not identify Harper as the May 9th gunman at that time. It was not until July 31, 1984—nearly three months after the robbery—that Lester and Small identified Harper in a police lineup as the person who had robbed them.

Based on the eyewitnesses' identifications, Harper was charged with first-degree robbery. Harper's first trial, in February 1985, ended in a mistrial with eleven of the twelve jurors voting for acquittal. During Harper's October 1985 retrial, defense counsel sought to probe the reliability of Small's eyewitness identification by cross-examining him about his emotional state during the robbery. As the following excerpt from the trial transcript shows, the trial judge cut off all such questioning:

> Defense Counsel: So, the very first time you had an idea there was going to be any kind of a problem here was when somebody bumps into you and tells you to give him the vest, is that correct?
> Witness: Yes, sir.
> Defense Counsel: How did you feel when those words were said?
> Prosecutor: Objection.
> The Court: Sustained.
> Defense Counsel: Did you have a reaction when those words were said to you?
> Prosecutor: Objection.

**1.** The Honorable Pierre N. Leval, of the United States District Court for the Southern District of New York, sitting by designation.

The Court: Sustained.

Defense Counsel: Were you scared?

Prosecutor: Objection.

The Court: Sustained.

Defense Counsel: Had you ever been the victim of a robbery before?

Prosecutor: Objection.

The Court: Sustained.

Defense Counsel: May I approach?

The Court: No, you may not.

Defense Counsel: May I approach?

The Court: No, you may not.

Harper was eventually convicted of first-degree robbery and sentenced as a second felony offender to a prison term of ten to twenty years. The Appellate Division affirmed Harper's conviction without opinion, *People v. Harper*, 123 A.D.2d 528, 506 N.Y. S.2d 502 (1st Dep't 1986), and the Court of Appeals denied his application for leave to appeal. *People v. Harper*, 68 N.Y.2d 1001, 510 N.Y.S.2d 1033, 503 N.E.2d 130 (1986). Harper subsequently filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 (1988), in the United States District Court for the Southern District of New York alleging, *inter alia*, that the trial court's rulings concerning Small's cross-examination violated Harper's Sixth Amendment right to confront the witnesses against him.

## DISCUSSION

The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Of all the rights covered by the Confrontation Clause, the right to cross-examine witnesses is perhaps the most important. In its earliest decision interpreting the Confrontation Clause, the Supreme Court wrote that cross-examination gives the accused an opportunity to "test[ ] the recollection and sift[ ] the conscience of the witness...." *Mattox v. United States*, 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). Twenty years ago, the Court called cross-examination the " 'greatest legal engine ever invented for the discovery of truth.' " *Cali-*

*fornia v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (quoting 5 J. Wigmore, Evidence § 1367 (3d ed. 1940)). Most recently, the Court reiterated this point: "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, —— U.S. ——, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990).

The right to cross-examine witnesses is especially critical when the only evidence against an accused is eyewitness identification. We have noted on several occasions the potential unreliability of convictions obtained on the basis of such evidence. In *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir.1978), a case involving a suggestive police lineup, we stated:

Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence.

We also addressed this concern in *Kampshoff v. Smith*, 698 F.2d 581, 585 (2d Cir. 1983), where we wrote:

There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial.... [W]hile juries may be led by their experience to believe their eyes, and, by inference, what they hear from those who have seen, that eyewitness testimony may sometimes be the least trustworthy means to identify the guilty.

■ We take this opportunity to reaffirm those concerns. When identification of the defendant depends solely on eyewitness testimony, the defendant must be afforded a meaningful opportunity to probe the reliability of that testimony. One of the most significant means to probe such testimony can be to question the witness about his thoughts and fears at the time of

the crime. A jury's conclusions might well be affected by whether an eyewitness either remained calm during the robbery and had a good look at the perpetrator or was so frightened that he could not see straight. Such testimony would be highly probative of the reliability of the witness' subsequent identification. *See, e.g., United States v. Smith,* 563 F.2d 1361, 1363 (9th Cir.1977) ("Any emotion, such as extreme fright, experienced by the witness during the criminal ordeal which might lessen the value of his later selection of the accused as the culprit ought to be weighed carefully."), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978).

■ On cross-examination, the defense sought to inquire into Small's thoughts and fears during his brief encounter with the gunman. The purpose of this aborted inquiry was to probe the reliability of Small's identification of the defendant, the critical issue in the trial. We know of no evidentiary basis to completely preclude this line of inquiry. Because the trial court's erroneous rulings denied the defendant a meaningful opportunity to impeach the reliability of a crucial eyewitness identification, we find that Harper's rights under the Confrontation Clause of the Sixth Amendment were violated.

■ In so ruling, we reaffirm, as did the Supreme Court in *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), that "trial judges retain wide latitude, insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination...." *Id.* at 679, 106 S.Ct. at 1435. All erroneous rulings that improperly restrict cross-examination under state or federal rules of evidence do not necessarily implicate the Confrontation Clause. Rather, the Constitution only " 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective, in whatever way, and to whatever extent, the defense might wish.' " *Id.* (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curium)). In this case, the vital importance of the opportunity to probe the reliability of the identification and the trial court's total preclusion of cross-examination readily implicate the constitutional guarantee.

■ The state argues and the district court held that the resulting Confrontation Clause error, if any, was harmless. In order to determine whether an error is harmless, a court must consider many factors, including:

the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438. Most important, a Confrontation Clause error is harmless only if, "assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* We disagree with the district court's holding and find that the state failed to meet its heavy burden of proving harmless error.

■ In Harper's case, which was based solely on eyewitness identification, the only eyewitness to the robbery other than Small was Lester. Lester's testimony, however, could not have carried much weight with the jury because cross-examination revealed that Lester did not identify Harper as the gunman during their extended face-to-face encounter in Sears' security office just three weeks after the robbery. It was not until a police lineup over two months later that Lester finally identified Harper. Accordingly, Small's testimony was the key (and perhaps the only) evidence that the jury considered in convicting Harper.

The state claims that Harper had the opportunity in his summation to argue that the fear of injury might have distorted Small's perceptions. This argument is unavailing for the simple reason that, as juries are admonished during every trial, counsel's arguments cannot substitute for actual evidence. Similarly, the state cannot

rely on the fact that the judge instructed the jury to consider "all the circumstances surrounding the crime," including "the mental and emotional state of the witnesses." Indeed, given this jury instruction, which appears to recognize the importance of the very testimony that the judge excluded, we have difficulty understanding why the judge sustained the state's objections.

Judgment reversed and case remanded with instructions to issue the writ unless the state, within a reasonable time not to exceed sixty (60) days, grants the petitioner a new trial.