**Donald FRANKOS, Plaintiff,**

v.

**Daniel SENDOWSKI, Superintendent Clinton Correctional Facility, Respondent.**

**No. 94 CV 9204 (BDP).**

United States District Court, Southern District of New York.

Aug. 9, 1996.

Joel Martin Arnou, White Plains, NY, for Plaintiff.

John J. Sergi, Asst. Dist. Atty., Westchester County District Attorney's Office, White Plains, NY, Valerie Singleton, Asst. Dist. Atty., New York State District Attorney's Office, New York City, for Defendant.

## MEMORANDUM DECISION and ORDER

PARKER, District Judge.

Petitioner Donald Frankos, who is currently incarcerated at the Clinton Correctional Facility in Dannemora, New York, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1983, Frankos was convicted of murder in the second degree in the Westchester County Court. On March 14, 1983, he was sentenced to a term of imprisonment of twenty-five years to life. The Appellate Division affirmed the judgment on April 8, 1985, and the New York Court of Appeals denied his application for leave to appeal. In July 1989, Frankos moved for an order vacating the judgment of conviction under New York Criminal Procedure Law § 440.10. Following an evidentiary hearing, the state *coram nobis* court denied the motion, and the Appellate Division denied Frankos' application for leave to appeal.

Frankos raises two grounds for issuance of the habeas writ. First, he asserts that his attorney's failure to object to the admission of a statement incriminating Frankos by his non-testifying co-defendant constituted ineffective assistance of counsel in violation of the Sixth Amendment. Second, Frankos contends that his physical abuse by the Westchester County Jail correctional officers before trial was of such an outrageous and shocking nature as to deny him a fair trial in violation of the Due Process Clause of the Fifth Amendment. Because his attorney allegedly did nothing to protect Frankos from this abuse, and did not object to proceeding to trial, Frankos also asserts that he was denied his Sixth Amendment right to effective assistance of counsel.

## BACKGROUND

At approximately 9:00 p.m. on September 12, 1981, two men shot and killed Clarence Jones outside the door to his apartment on the twentieth floor of a building at One Glenwood Avenue in Yonkers. Frankos was arrested on October 16, 1981, two weeks after the arrest of his co-defendant Joseph Kersch on October 1, 1981. On October 21, 1981, Frankos was charged with the murder of Jones and related crimes. Kersch was also charged with the murder of Jones and related crimes, but in a separate indictment. Upon a motion by the prosecution, the indictments were consolidated for trial.

The case was tried to a jury in Westchester County Court in January of 1983. Michael DiStefano testified for the prosecution. DiStefano testified that he had been arrested for burglary in September 1981, and while detained in the Suffolk County jail in November, told the police that he had information regarding a murder committed by Kersch. DiStefano testified that in September of

1981, he had accompanied Kersch to New York City. According to DiStefano, Kersch asked DiStefano to go and see a particular girl at a motel, and told DiStefano that after giving her Kersch's gold necklace, she would give him an envelope. After seeing the girl and giving Kersch the envelope, DiStefano walked with him towards Penn Station. As they walked, DiStefano testified that Kersch told him that he could not go to the hotel because he believed that it, and his apartment, were being watched.

DiStefano then testified that Kersch told him "that he was hired with another man to kill another man.... He mentioned that he was hired by a man named 'the Greek,' I believe, and that they were hired for five thousand dollars, to split, to kill a man what he believed was over a drug deal. That this man, the victim, owed some money to the people who hired him ..." Trial counsel made no objection.

Later in the trial, the prosecution elicited testimony directly identifying Frankos as "the Greek." The prosecutor asked Detective Sergeant John Roach: "without telling us who you spoke to, did you have occasion on or about the 18th or 19th of September to determine whether or not Donald Frankos in known by any other nickname?" Roach answered: "Yes, known by another name of Tony the Greek." At that point, trial counsel objected, the trial court sustained the objection and instructed the jury to disregard the statement.

In summation, the prosecutor without objection argued that,

> this killing at One Glenwood Avenue, this was a cold-blooded murder for hire. It was a purely intentional killing. It wasn't a fight in a bar, it didn't start out as a robbery that went sour. It wasn't a domestic squabble. It wasn't some crime of passion. It was a cold-blooded murder. They didn't even know who they killed except that they got paid some money to do it.... Counsel tells you well, what kind of professional hit man, what kind of a professional killer was Donald Frankos? Well, again, we don't have to prove motive, ladies and gentlemen. But no one says this man is a professional. All we're say-

ing, he was hired to kill someone. No one says he's smart. No one says he's good at what he does. He was hired to kill someone ... Well, all we know is that he was there. He was present at the killing. We know through the testimony that the killers were hired.

## DISCUSSION

### 1. Ineffective Assistance of Counsel

■ "To establish a constitutional claim of ineffective assistance of counsel, a convicted defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the deficiency, the likely outcome of the proceeding would have been different." See Mason v. Scully, 16 F.3d 38, 42 (2d Cir.1994) (citing Strickland v. Washington, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 2064–69, 80 L.Ed.2d 674 (1984)). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Mason, 16 F.3d at 42 (internal quotations and citations omitted).

■ Frankos claims that the hearsay statements of Kersch, a non-testifying co-defendant, introduced through the testimony of DiStefano, were used against him in violation of the Confrontation Clause and the rule set forth in Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). He contends that his attorney's failure to object to their admission and use by the prosecutor during summation violated his Sixth Amendment constitutional right to effective assistance of counsel.

Frankos raised the instant ineffective assistance of counsel claim in his CPL § 440.10 motion. After a hearing, the state court issued a written decision, dated October 10, 1990, concluding that the admission of Kersch's statement through DiStefano did not constitute a Bruton violation, that trial counsel's failure to object did not constitute ineffective assistance of counsel, and that even if the admission of Kersch's statement did constitute a Bruton violation, there was not a reasonable probability that but for its admission the result of the trial would have been different.

In evaluating Frankos' claims, this Court must presume correct the state court's findings of fact. Under 28 U.S.C. § 2254(d), "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction [and] evidenced by a written finding ... shall be presumed to be correct ...," unless, among other things, "the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record," or the petitioner establishes "by convincing evidence that the factual determination by the State court was erroneous." Because Frankos does not challenge the state court's factual findings on this issue and this Court finds the state court's findings of fact to be fairly supported by the record, they are presumed correct.

The state court specifically found that the Yonkers Police interviewed DiStefano in the Suffolk County Jail on November 19, 1981, and DiStefano told them that Kersch admitted that he was "on the run for a murder" and that he had been hired by a man named "the Greek" to kill another man, and that they in fact shot this other man. The state court further found that at trial neither of the defendants testified, but that the pretrial statements made by Kersch were testified to by the witness DiStefano. In addition the state court found that during DiStefano's direct testimony, the following exchange occurred:

Q. Now, what was that conversation? To the best of your recollection, what did you ask him and what did he say to you, if you recall?

A. It started out with the reason he couldn't go to the hotel was he stated, was that he believed the police were watching the motel and his apartment were [sic] he lived. He also began to state why, that he was hired with another man to kill another man.

Q. Did he say who this other man was?

A. No.

Q. Go on.

A. He mentioned that he was hired by a man named the Greek, I believe, and that they were hired for five thousand dollars, to split, to kill a man what he believed was over a drug deal. That this man, the victim, owed some money to the people who hired him, something to the sort.

The State Court noted that trial counsel testified that he immediately recognized that the statement was possibly inculpatory, but chose not to make an immediate objection before the jury or interrupt the trial with a request for side-bar, because he was of the view that such procedures would do no more than heighten any potentially inculpatory effect of the testimony. The State court further found that although trial counsel testified that it was his recollection that he subsequently objected at side-bar to the potential problem, he later admitted that upon his review of the trial transcript, he found no side-bar conference recorded in those minutes at that particular point.[1] The state court also found that trial counsel elected not to cross-examine DiStefano because he felt that DiStefano's trial testimony was less damaging to Frankos than DiStefano's grand jury testimony.[2]

The state court further found that later in the trial the prosecution elicited testimony identifying Frankos as "the Greek." The state court found that trial counsel objected and the jury was instructed to disregard the statement. Finally, the state court found

---

1. Trial counsel later moved for a mistrial on other grounds. During cross-examination of DiStefano, Kersch's attorney mistakenly elicited previously redacted statements concerning Kersch's participation in an unrelated burglary from DiStefano. DiStefano testified: "We [DiStefano and Kersch] ended up back at the motel late, maybe six or seven in the morning the following day after doing a burglary together." Kersch's attorney immediately requested a side bar and moved for a mistrial. The court denied the motion, and Frankos' trial counsel then moved for a mistrial on the ground that spill-over from that testimony would prejudice Frankos. The Court denied Frankos' application but offered to instruct the jury that any admission made by Kersch could not be used against Frankos.

2. Trial counsel testified that DiStefano testified before the Grand Jury that Kersch told him that he was hired with a man called "the Greek," rather than hired by a man named "the Greek."

that during the final charge, the trial court instructed the jury not to draw any inference from an unanswered question or from testimony which has been stricken and that "a statement or admission made by one defendant can be considered by you as evidence as to the guilt or nonguilt of that defendant who allegedly made the statement but may not be considered by you as evidence against any other defendant."

■ The "high measure of deference" accorded to the state court's findings applies only to underlying issues of fact. *See Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982). This Court must review *de novo* the state court's conclusion that those factual circumstances demonstrate that Frankos received effective assistance of counsel. *See Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994).

■ In *Bruton,* the Supreme Court held that a defendant's right to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him:

> Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift the blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice … does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

*Bruton,* 391 U.S. at 136, 88 S.Ct. at 1628 (footnotes omitted).

"To implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly, but may contain an accusation that is only implicit." *Mason,* 16 F.3d at 42–43 (citing *United States v. Danzey,* 594 F.2d 905, 917–18 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979)). For example, in *Danzey,* an officer testified that the codefendant had admitted committing 15 robberies and had named nine accomplices. Although the officer did not recite the names given by the codefendant, the clear implication was that the defendant was one of those named. The Court held that the defendant's right of confrontation was violated. *See Danzey,* 594 F.2d at 917–18. *See also United States v. Reynolds,* 715 F.2d 99, 105 (3d Cir.1983) (finding Confrontation Clause violation where officer testified that after codefendant was arrested and defendant appeared on the scene, codefendant said, "I didn't tell them anything about you," implying that there was something incriminating to be told). This Circuit, "[i]n general, … has condemned practices designed to circumvent these principles by asking a witness what he learned from an out-of-court declarant." *Mason,* 16 F.3d at 43 (citing *United States v. Figueroa,* 750 F.2d 232, 240 (2d Cir.1984); *United States v. Check,* 582 F.2d 668, 678–79 (2d Cir.1978)).

Here, DiStefano's testimony violated Frankos' right of confrontation. The fact that there had not yet been any testimony that Frankos was known as "the Greek" is immaterial. Kersch's hearsay statement referred to Frankos by an identifying nickname. This was not a case in which a hearsay statement was redacted so as to omit all reference and indication of the defendant, *see Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), or where the name of a codefendant was replaced by a neutral pronoun, with no indication to the jury that the original statement contained an actual name, and where the statement standing alone did not otherwise connect the codefendant to the crime, *see United States v. Tutino,* 883 F.2d 1125, 1135 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Alvarado,* 882 F.2d 645, 652–53 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). The ready inference was that Frankos was "the Greek," because he was the codefendant and because he was greek. The clear implication that the prosecutor sought to elicit through hearsay testimony was that Frankos had a contract to kill Jones.

Both the prosecutor and trial counsel knew what DiStefano's testimony would be. Trial counsel testified at the hearing before the state court that Kersch's statement to DiStefano was the subject of a pretrial motion, and the trial judge had redacted any reference to "the Greek." Thus, both the prosecutor and trial counsel were aware of a possible *Bruton* violation when DiStefano took the stand. Notwithstanding the obvious impropriety of DiStefano's testimony, trial counsel failed to object or move for a mistrial when the prosecutor elicited the testimony that Kersch had been hired by "the Greek." There is no indication in the record that either counsel ever brought the error to the attention of the trial judge.

When the prosecutor later elicited testimony that Frankos was called "the Greek," trial counsel objected and the trial court instructed the jury to disregard the statement. Trial counsel, however, failed to object to the limiting instruction or to move for a mistrial despite the Supreme Court's unequivocal ruling in *Bruton* that limiting instructions cannot substitute for the right to cross-examination:

> Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

*Bruton,* 391 U.S. at 137, 88 S.Ct. at 1628. *See also United States v. Kyles,* 40 F.3d 519,

526 (2d Cir.1994) (" 'the district judge's attempt to neutralize the Sixth Amendment violation by instructing the jury to disregard [the official]'s testimony was ineffective because limiting instructions do not cure the prejudice that such violations may cause to a defendant.' ") (quoting *Bruton,* 391 U.S. at 135–36, 88 S.Ct. at 1627–28), *cert. denied,* —— U.S. ——, 115 S.Ct. 1419, 131 L.Ed.2d 302 (1995).

Although the state court found that trial counsel testified that his failure to object and his failure to seek to have the testimony stricken was tactical, *Mason* held that because the *Bruton* principle has long been established, "[t]here can be no suggestion that these failures [to object and to have witness's testimony stricken] were tactical." *Mason,* 16 F.3d at 44. Here, because trial counsel failed to object, the *Bruton* issue was not preserved for review, and consequently, the Appellate Division declined to reach the merits of the issue. *See People v. Frankos,* 110 A.D.2d 713, 487 N.Y.S.2d 822, 824 (2d Dept.1985). Accordingly, because trial counsel failed to object to an incriminating hearsay statement identifying Frankos by name, this Court believes that trial counsel's performance fell below the constitutional standard.[3]

■ Nonetheless, this conclusion does not end our inquiry because Frankos must still meet the second part of the Strickland test, that is, but for trial counsel's deficient performance, the likely outcome of the trial would have been different. In addressing this question, I take into consideration such factors as:

> Frankos asserts that the only proof at trial that Jones' killing was a contract murder was Kersch's statement. While Frankos is correct that Kersch's statement was the only evidence directly linking Frankos and Kersch with the contract to kill Jones, Korwatch testified that he learned in the course of his investigation that Freddie Meyers had taken out a contract on Jones' life. Because there was other evidence, besides DiStefano's testimony, that Frankos was one of the two men that killed Jones, and that there was a contract out on Jones' life, the prosecutor's argument that Frankos was hired to kill Jones was not so clearly improper that trial counsel's failure to object here by itself could be considered ineffective assistance of counsel.

---

**3.** Frankos also argues that trial counsel failed to object during summation when the prosecutor relied upon Kersch's hearsay statement to argue that Frankos was hired to kill Jones, thereby further compounding the *Bruton* violation. In his closing statement, the prosecutor argued that the testimony showed that Frankos was hired to kill Jones: "[T]his killing at One Glenwood Avenue, this was cold blooded murder for hire.... They didn't even know who they killed. They had nothing against the man that they killed except that they got paid some money to do it." The prosecutor continued: "He [Frankos] was hired to kill someone ... Well, all we know is that he was there. He was present at the killing. We know through the testimony that the killers were hired."

the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Mason*, 16 F.3d at 44 (quoting *Harper v. Kelly*, 916 F.2d 54, 57 (2d Cir.1990), *cert. denied*, 499 U.S. 943, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991)) (other citations omitted).

I am persuaded here that the *Bruton* error and trial counsel's failure to object was harmless. First, there was other evidence that Jones' killing was a contract murder. Korwatch testified that, during the course of his investigation of Jones' murder, he received information that Freddie Meyers, a major drug dealer, who also lived at One Glenwood Avenue, and who Jones had assaulted with a baseball bat on August 13, 1981, had put out a contract on the life of Jones. Korwatch further testified that he learned that, on September 17, 1981, Freddie Meyers was in Las Vegas "until the heat cools off."

Although DiStefano's testimony was important in the prosecution's case against Kersch, it was of marginal significance in the case against Frankos. There was substantial other evidence that Frankos was one of the two men that killed Jones, including the testimony of Sonya Fishburne, an eyewitness to the murder, who later identified Frankos in a police photographic array and lineup, and the testimony of Steve Kokias, who loaned Frankos the car that two other witnesses identified as the car in which two white men fled from the scene of the murder.

Fishburne testified that, on September 12, 1981, she and Jones exited his apartment. While Jones locked the door, Fishburne testified that she proceeded to the elevators, passing and greeting a white male whom she later identified in a police line-up as Frankos. Fishburne testified that she took particular note of his appearance because she was not accustomed to seeing white people in the building. According to Fishburne, the man turned the corner and disappeared from her sight. The elevator arrived. After waiting in the elevator for a moment, she stepped back out to look for Jones. As Jones joined her, Fishburne testified that Frankos and another man jumped out at them from around the corner, each with a gun in his hand. According to Fishburne, Frankos yelled "Police, hold," and the other man pointed his gun at Jones while Frankos pointed his gun at her. Frankos then instructed them to get back in Jones' apartment. Fishburne stated that when Jones identified an apartment next door as his, the other man shot Jones in the face. Fishburne stated that she fled down the hallway, and hid safely in a refuse room located just beyond a stairwell until Frankos and the other man fled the scene. She testified that she was later taken to police headquarters where she gave a description of both men. On September 19, 1981, Fishburne identified Frankos from a photographic array, and on October 16, 1981, identified him in a police lineup.

Kokias testified that on September 10, 1981, he drove his car to a Greenwich Village bar called the Cafe Picasso, owned by his cousin, Taki Iatropoulous. According to Kokias, he struck up a conversation with a male patron, who introduced himself as "Tony," and whom Kokias identified at trial as Frankos. Kokias testified that he returned to the Cafe Picasso the next day, and that Iatropoulous introduced him to a friend of Tony's named "Joe," whom Kokias identified at trial as Kersch. Kokias stated that he spoke with Joe for an hour, during which time they were joined by Frankos. According to Kokias, Frankos asked him if he could borrow a car in order to visit his girlfriend in Yonkers. Kokias testified that he was reluctant at first, but finally agreed after Iatropoulous assured him that he knew Frankos. Kokias stated that, before leaving, Frankos told him that he would "take care" of him for loaning the car by paying him several hundred dollars. Kokias further stated that Frankos and Kersch returned his car to him at the Cafe Picasso at approximately 3:00 a.m. on the morning of September 13th.

Two other witnesses, Wendall Wiggins and Gerald Fay, testified that, on the evening of September 12, 1981, although not together,

they were both outside Jones' apartment building, when they saw two white males jump into a car and drive away in the dark without turning on the headlights. Wiggins testified that the car was a Buick Skylark and later identified it at a police garage in Yonkers. Fay testified that he took note of six of the seven characters in the license plate number, and later contacted the police with that information. Officer Korwatch testified that he used the information from Fay to trace the car to Kokias, who owned a Buick Skylark with a seven-digit license plate number composed of the six characters identified by Fay, and which Wiggins later identified as the car he saw.

In light of this evidence, I conclude that, but for counsel's deficient performance, the likely outcome of the trial would not have been different.

### 2. *Denial of Due Process*

 Frankos' second claim is that the brutal treatment he received at the hands of the Westchester County correctional officers was so egregious and outrageous that it deprived him of a fair trial in violation of his Fifth Amendment right to due process and Sixth Amendment right to effective assistance of counsel. Specifically, Frankos claims that, directly prior to trial, while detained at the Westchester County Jail, he was severely beaten, and repeatedly threatened and harassed by jail officials. He also claims that jail officials destroyed his legal papers. He claims that the beating and threats kept him in a constant state of fear during trial such that he was unable to assist in his defense, and that his beaten and bruised appearance prejudiced the jury. Because his trial counsel did nothing under these circumstances except request that he be transferred to another institution, Frankos asserts that he was also denied his Sixth Amendment right to effective assistance of counsel.

Frankos raised the instant Fifth Amendment claim in his CPL § 440.10 motion. After an evidentiary hearing in which Frankos and an expert witness on his behalf testified, the state court issued a written decision on October 10, 1990, in which it concluded that Frankos had failed to establish that he sus-

tained the type of serious or psychological injuries which would constitute a violation of due process. With respect to Frankos' ineffective assistance of counsel claim, the state court concluded that it could find no fault with trial counsel's handling of the matter.

Again, in evaluating Frankos' claims, this Court must presume correct the state court's findings of fact, unless such factual determination is not fairly supported by the record or Frankos establishes by convincing evidence that the factual determination was erroneous. *See* 28 U.S.C. § 2254(d). Frankos has not offered any evidence demonstrating that the findings of fact of the state court were erroneous, and, upon review of the transcript of the hearing before the state court, this Court concludes that the state court's findings of fact were fairly supported by the record. Therefore, in accordance with 28 U.S.C. § 2254(d), the state court's findings of fact are presumed correct.

As noted above, however, the deference accorded to the state court's findings applies only to underlying issues of fact, and this Court must review *de novo* the state court's conclusions of law. *See Sumner*, 455 U.S. at 598, 102 S.Ct. at 1307. Therefore, this Court reviews *de novo* the state court's conclusion that its factual findings demonstrate that Frankos was not denied due process of law nor effective assistance of counsel.

The Second Circuit has recognized that the Due Process Clause is properly invoked as the source of constitutional protection against violence inflicted on a pretrial detainee. *See Brown v. Doe*, 2 F.3d 1236, 1242 (2d Cir. 1993) (" 'The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.' ") (quoting *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989)) (other citations omitted), *cert. denied*, 510 U.S. 1125, 114 S.Ct. 1088, 127 L.Ed.2d 403 (1994). In *Brown*, the state court proceedings had established that the petitioner was brutally beaten, causing him to sustain a broken neck, by law enforcement officials for five successive nights during his pretrial detention at the Rockland County jail. On appeal from the denial of a petition for a writ of habeas corpus, the Court noted

that the state court also found that there was no causal link between the constitutional violation and the evidence offered to convict the petitioner. The Court concluded: "The official misconduct therefore did not affect the reliability of the trial verdict." *Brown,* 2 F.3d at 1242.

*Brown* held that, because the defendant was lawfully arrested and convicted on untainted evidence, the proper remedy for official misconduct was not dismissal of the indictment. "[T]he wrong committed by the police has its own remedies. It is unnecessary to remedy that wrong by absolving [the petitioner] of his own crime, and there is no interest of justice served by a result in which the community suffers two unpunished wrongs." *Brown,* 2 F.3d at 1242. The Court concluded that more appropriate remedies, such as a civil action under 42 U.S.C. § 1983 or even a criminal prosecution of those who committed the assault, were available to the petitioner. *See Brown,* 2 F.3d at 1243.

Here, the state court proceedings established that on the night of January 13, 1983, Frankos suffered "multiple soft tissue" injuries in an altercation with several correctional officers while detained at the Westchester County Jail. The trial court ordered immediate medical attention, which he received, and adjourned the proceedings for several days, although it denied Frankos request for transfer to another correctional facility. The state court further found that when trial counsel visited Frankos in jail that night, Frankos was agitated but had no difficulty understanding or participating in the discussion. During jury selection and trial, trial counsel and the trial court observed that Frankos appeared to be in good physical condition. Although Frankos expressed fear to his counsel about his detention at the Westchester County Jail, the state court found that he did not complain any further about beatings or psychological abuse.

Frankos alleges that the beatings and psychological trauma that he suffered prevented him from assisting in his defense. He has not, however, provided this Court with any evidence of that claim, and the state court specifically found that Frankos testimony at the hearing lacked credibility because it was inconsistent with the medical reports and the testimony of the trial judge and trial counsel. The state court also dismissed the opinion of Frankos' expert witness that Frankos was of "questionable" mental competency during trial, because it was based only on the expert's reading of an excerpt of the transcript of the court proceedings on January 14, 1983, and a single, one-hour stress evaluation interview with Frankos, in which the expert failed to learn about Frankos' background or criminal history. Thus, accepting that Frankos was unjustly and severely beaten during detention, because he has not established that the official misconduct affected the reliability of the verdict in any way, his remedy is more appropriately a civil action under 42 U.S.C. § 1983.[4] *See Brown,* 2 F.3d at 1242–43.

That Frankos' remedy is more appropriately a civil action under 42 U.S.C. § 1983 is also true with respect to his claim that jail officials destroyed his legal papers in the course of the beating on January 13, 1983. *Cf. Crawford–El v. Britton,* 951 F.2d 1314, 1321 (D.C.Cir.1991), *cert. denied,* 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 29 (1992). Although Frankos raised this claim in his CPL § 440.10 motion, the state court did not address it. The transcript of the court proceeding of January 14, 1983, however, reveals that Frankos asserted that in the course of the beating the night before "[t]hey took all my legal papers." At the hearing conducted by the state court, Frankos testified that jail officials destroyed a list of alibi witnesses. Frankos has not established, however, that the destruction of this list prejudiced his defense.

Frankos also claims that his beaten and bruised appearance prejudiced the jury. The state court specifically found, however, that on January 19, 1983, and for the duration of jury selection and the trial, both the trial court and counsel observed Frankos to be in good physical condition. In light of this factual finding, this Court cannot conclude that Frankos' was denied due process because the jury was prejudiced by his appearance.

---

4. In fact, Frankos has already pursued such an action. That case was settled in April of 1987.

Finally, with regard to his ineffective assistance of counsel claim, based on his counsel's doing "nothing whatsoever to protect his client from such egregious misconduct ..., except for making one perfunctory request that the defendant be transferred to another holding facility," the state court specifically found that on January 14, 1983, trial counsel sought and procured immediate medical attention for Frankos, requested and received an adjournment, and requested that Frankos be transferred to another institution. The state court further found that the trial court denied the request for transfer over trial counsel's strenuous objection. Finally, the state court found that there was no evidence of further episodes of physical or psychological abuse. In light of these findings, this Court cannot conclude that trial counsel's performance fell below an objective standard of reasonableness. Thus, Frankos has not established the first element of a claim for ineffective assistance of counsel based on trial counsel's handling of this matter. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

In conclusion, petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

SO ORDERED.