Terrence E. MASON, Petitioner–Appellee,

v.

Charles J. SCULLY, Superintendent, Green Haven Correctional Facility, Respondent–Appellant.

No. 963, Docket 93–2632.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1993.

Decided Feb. 7, 1994.

Before: OAKES, KEARSE, and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Respondent Charles J. Scully, Superintendent of New York State's Green Haven Correctional Facility (the "State") appeals from a judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, *Judge,* granting the petition of Terrence E. Mason, a New York State prisoner convicted of robbery, for a writ of habeas corpus on the ground that his trial counsel's performance was so inadequate as to violate his rights under the Sixth and Fourteenth Amendments to the Constitution. On appeal, the State contends that the district court erred in concluding that the quality of trial counsel's representation fell below professional standards and that the inadequacy prejudiced Mason's defense. We disagree and affirm the judgment of the district court.

## I. BACKGROUND

On December 21, 1986, four men—three blacks and one hispanic—entered Golden City Jewelers (the "Store") in Queens, New York, drew guns, and stole approximately $100,000 worth of jewelry. During the following month, George Rivera, Christopher Arthur, Kevin Moore, and Mason were arrested, and each was charged with one count of first-degree robbery, in violation of N.Y.Penal Law § 160.15[4] (McKinney 1981), and one count of second-degree robbery in violation of *id.* § 160.10[1]; Mason was also charged with other counts that were subsequently dismissed. Rivera, Arthur, and Moore pleaded guilty to second-degree robbery. Mason elected to stand trial. His defense was misidentification.

### A. The State–Court Trial

At Mason's jury trial in New York Supreme Court in June 1987, none of the three men who had pleaded guilty to the robbery was called to testify. Nor was there any evidence that Mason's fingerprints were found in the store, or in the getaway car, or on any of the stolen jewelry that was recov-

Georgia J. Hinde, New York, New York (Vivian Shevitz, New York, New York, on the brief), for petitioner-appellee.

Linda Cantoni, Assistant District Attorney, Kew Gardens, New York (Richard A. Brown, District Attorney for Queens County, Steven J. Chananie, Robin A. Forshaw, Assistant District Attorneys, Kew Gardens, New York, on the brief), for respondent-appellant.

ered. The recovered jewelry was found in the apartment of Arthur's girlfriend; there was no evidence that Mason had any association with anyone connected with that apartment. Rather, the State's evidence at Mason's trial consisted principally of the testimony of investigating police detective Phillip Fuhr and three eyewitnesses: (1) Sam Rouhani, the Store's owner, (2) Mohammed Weiss, a salesman, and (3) Larry Taylor, a security guard. A fourth eyewitness did not testify.

Rouhani and Weiss had not been asked to view Mason in a pretrial lineup or a photographic array and testified that they could not recall any distinguishing features that would permit them to identify him. They were able to identify him at trial, however. He was the only black man sitting at the defense table.

Taylor, who likewise was unable to recall any distinguishing features, identified Mason both in a pretrial lineup and at trial. According to Taylor's trial testimony, on the afternoon of December 21, 1986, Mason and three other men entered the Store. Mason told Taylor his name was "Gerard" and asked about the price of a gold nameplate. Taylor told him it cost $550; when Mason said he had only $20 with him, Taylor told him that was not enough to start a layaway plan. Mason said he would ask his wife for more money; he then left the store and Taylor followed, returning when he saw Mason go to a telephone. Mason soon reentered the Store and said that his wife would not give him more money; Taylor told him he could give the boss the $20 and bring in more money later. At that point, Mason and the three other men drew their guns and robbed the store.

Taylor testified that his conversation with Mason had lasted 8–15 minutes. Through Detective Fuhr, trial counsel brought out evidence that in the six-man lineup conducted a month after the robbery, it had taken Taylor three minutes to identify Mason.

A report describing the statements of the eyewitnesses given to the police shortly after the robbery (the "police report") was quite different from Taylor's trial account of the event. According to the police report, the four men simply entered, produced guns, and proceeded to rob the Store. On the day following the robbery, after the police received a tip from a confidential informant (see below), the four eyewitnesses were shown a photographic spread, and one or more of them identified photographs of Rivera and Arthur. The police report stated that the

[w]itnesses said that Rivera appeared to be in charge of the robbery and added that he came into their store the day before the robbery & gave an order for a gold nameplate "GERARD" to the owner.

The police report contained no indication that any of the witnesses said he had spoken with any of the robbers other than Rivera, or that Taylor said he had had a sale-related conversation with any of the robbers on the day of the robbery, or that any witness said any of the robbers had left the store on the day of the robbery and returned. Mason's trial counsel made no attempt to use the police report to impeach Taylor's testimony.

The State's other principal witness was Detective Fuhr, who investigated the robbery. According to the police report, after the robbery a confidential informant had informed the police that three of the men who had robbed the Store were Rivera, Arthur, and Moore; the informant had not seen and could not identify the fourth man. Fuhr testified that between January 6 and January 13, 1987, he arrested Rivera, Arthur, and Moore. The prosecutor then proceeded to question Fuhr as follows:

Q. And, after the lineup [in which Taylor identified Rivera], was a conversation held with George Rivera?

This is a yes or no question.

A. Yes.

Q. And, after this conversation with George Rivera, were you looking for somebody?

A. Yes, I was.

Q. And, who were you looking for?

A. Terrence Mason.

Mason's trial counsel had requested at the start of trial that the prosecution not be allowed to introduce any evidence of statements by Mason's nontestifying codefend-

ants, and the trial court had cautioned the prosecutor to be mindful of that problem. Nonetheless, trial counsel made no objection to the prosecutor's questions eliciting that Fuhr's conversation with Rivera had led Fuhr to look for Mason. Nor did trial counsel move to strike or otherwise limit the prosecutor's use of that testimony.

In his summation, the prosecutor argued:

What else does Philip Fuhr do?

He asks around. He conducts a police investigation. Eventually, he makes a number of arrests.

.... It was brought out that Kevin Moore, Christopher Arthur were apprehended....

Later, we have the arrest of George Rivera. More conversations, more information.

Eventually, the Defendant, Terrence Mason, is apprehended.

Mason's trial attorney made no objection to the summation.

The jury deliberated, then asked to have read back Taylor's testimony and the "testimony of Detective Fuhr, relating to the apprehension of the Defendant." Mason's trial counsel made no objection; the testimony was read to the jury. Sometime later, the jury advised the court that it was not able to reach a verdict and that even if it deliberated for days it would not be able to decide the issue. The court delivered an *Allen* charge (*Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). Later that day, the jury returned a verdict of guilty. The court sentenced Mason to two concurrent terms of 10–20 and 6–12 years' imprisonment.

### B. *The State Postconviction Proceedings*

In connection with his state appeal and post-conviction proceedings, Mason was represented by new counsel ("appellate counsel"), who argued that Fuhr's testimony, by implying that Fuhr had begun looking for Mason as a result of a statement by Rivera, violated Mason's right to confront his accusers. Mason's conviction was affirmed by the Second Department, which ruled that because his trial counsel had failed to object,

Mason had failed to preserve his confrontation claim for review. *See People v. Mason,* 170 A.D.2d 464, 565 N.Y.S.2d 552 (2d Dept.), *leave to appeal denied,* 77 N.Y.2d 997, 571 N.Y.S.2d 923, 575 N.E.2d 409 (1991). The court also ruled that, "in any event, any error in this regard was harmless beyond a reasonable doubt ... in view of the overwhelming evidence of guilt...." *Id.* Leave to appeal to the Court of Appeals was denied. *See People v. Mason,* 77 N.Y.2d 997, 571 N.Y.S.2d 923, 575 N.E.2d 409 (1991).

In the meantime, Mason's appellate counsel had asked trial counsel why there had been no objection to the prosecution's elicitation and use of the Fuhr testimony as to the conversation with Rivera and why there had been no impeachment of Taylor with the police report. As to the latter, trial counsel responded that he "must not have noticed" the contents of the police report; as to the former, he made no response. Appellate counsel petitioned the trial court pursuant to N.Y.Crim.Proc.Law § 440.10 (McKinney 1981) to set aside the conviction on the ground that the performance of Mason's trial attorney had been constitutionally ineffective. The trial court denied the petition. Leave to appeal this order to the Appellate Division was denied.

Mason also filed a complaint with the State Bar Grievance Committee with respect to trial counsel's performance. Trial counsel, notwithstanding his earlier statement to Mason's appellate counsel that he "must not have noticed" the contents of the police report, told the Committee that he had "chose[n] not to make an issue of" the allegedly inconsistent statement in the police report "lest it backfire." Even to the Grievance Committee, he offered no explanation for his failure to object to the testimony of Fuhr. The Committee eventually informed Mason that it had made "a full investigation" and had decided to dismiss the complaint.

### C. *The Decision Below*

In September 1991, Mason commenced the present action *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988) on the ground that he had been denied the effective assistance of counsel principally be-

cause of trial counsel's failure to protect his confrontation rights. The district court appointed counsel to represent him.

In a ruling from the bench, the district court announced that it would grant Mason's habeas petition. The court stated that it might not have found counsel's performance to be below the constitutionally acceptable level based simply on his initial failure to object to the implied hearsay called for and given during Fuhr's testimony; however, the combination of that failure and the continued failure to object to that testimony when the jury requested that it be read back made trial counsel's performance constitutionally ineffective. The court said the request for a read-back and the jury's temporary deadlock made it impossible for the court to conclude that the hearsay reference to the conversation with Rivera had not affected the outcome of Mason's trial. (Hearing Transcript, September 24, 1993, at 2–7.)

The district court also found, though it declined to grant the writ on this basis, that counsel's failure to impeach Taylor could not be ignored:

> [A]ll but one of the eyewitness identifications wasn't worth very much and the one that arguably the jury was more impressed with could have been subject in my judgment to very damaging cross-examination and while he submitted some document, affidavit I guess in a disciplinary proceeding saying that there were strategic ground[s, h]e didn't say what he was afraid of particularly with respect to the critical eyewitness in this case.

(*Id.* 7.)

In a written order dated September 23, 1993, the court ordered the State to retry Mason within 90 days of the date of the order. This appeal followed. The order for a new trial was stayed pending appeal.

## II. DISCUSSION

To establish a constitutional claim of ineffective assistance of counsel, a convicted defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the deficiency, the likely outcome of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S.Ct. 2052, 2064–69, 80 L.Ed.2d 674 (1984) ("*Strickland*"). Actions or omissions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. *Id.* at 689, 104 S.Ct. at 20 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

On the present appeal, the State argues that the district court erred in upholding Mason's claim because (1) the testimony elicited from Fuhr did not violate Mason's Confrontation Clause rights, and that even if it did, trial counsel's failure to object was not below professional standards; and because (2) even if trial counsel's performance was substandard, his failures did not result in prejudice. We disagree with each contention.

### A. *The Right of Confrontation and Counsel's Failure To Protect It*

A defendant's right to confront the witnesses against him includes the right not to have the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him. *Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968) ("*Bruton*").

> Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice ... does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

*Bruton,* 391 U.S. at 136, 88 S.Ct. at 1628 (footnotes omitted); *see also Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 20, 90 L.Ed.2d 514 (1986) (codefendant's postarrest accusation of defendant is "presumptively unreliable").

To implicate the defendant's confrontation right, the statement need not have

accused the defendant explicitly but may contain an accusation that is only implicit. *See, e.g., United States v. Danzey,* 594 F.2d 905, 917–18 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). In *United States v. Danzey,* 594 F.2d at 917–18, for example, an officer testified that the codefendant had admitted committing some 15 robberies and had named nine accomplices. Though the officer did not recite the names supplied by the codefendant, the clear implication was that the defendant was one of those named. We held that the defendant's right of confrontation was violated. *See also United States v. Reynolds,* 715 F.2d 99, 101, 104–05 (3d Cir.1983) (Confrontation Clause violation to allow officer to testify that after codefendant was arrested and the defendant appeared on the scene, codefendant said, "I didn't tell them anything about you," implying that there was something incriminating to be told). In general, this Court has condemned practices designed to circumvent these principles by asking a witness what he learned from an out-of-court declarant. *See, e.g., United States v. Figueroa,* 750 F.2d 232, 240 (2d Cir.1984); *United States v. Check,* 582 F.2d 668, 678–79 (2d Cir.1978).

The New York State courts have likewise declared it "obviously improper" to create in jurors' minds the impression that a codefendant's unreported statement led to the defendant's arrest. *See, e.g., People v. Tufano,* 69 A.D.2d 826, 828, 415 N.Y.S.2d 42, 43 (2d Dept.1979) (mem.) (reversing conviction because of cumulative effect of trial errors); *see also, e.g., People v. Cummings,* 109 A.D.2d 748, 750, 485 N.Y.S.2d 847, 849 (2d Dept. 1985) (mem.) (refusing to review admission of implicit-accusation testimony because there was no defense objection). In *People v. Tufano,* which bears a remarkable similarity to the present case, two men had robbed a pharmacy. The police arrested one Terenzi, who pleaded guilty to a lesser crime and implicated the defendant Tufano. Terenzi did not testify at trial, and the prosecution's case rested primarily on the eyewitness testimony of the owner of the pharmacy. In addition, the prosecution introduced the testimony of Walsh, a police detective, in an "attempt[ ] to show that the police investigation had first led to Terenzi, and that it was

Terenzi's statement that led them to arrest Tufano." 69 A.D.2d at 827, 415 N.Y.S.2d at 43. The Second Department found this impermissible:

> Walsh was permitted to testify that he had had a "conversation" with Terenzi and that defendant was arrested shortly thereafter. Terenzi was not called as a witness.
>
> It was error for the trial court to permit Walsh to testify concerning his conversation with Terenzi. Any statements made by Terenzi in the course of the conversation were, of course, hearsay, and therefore inadmissible. While the precise contents of the conversation were not revealed on direct examination, it was clearly the Assistant District Attorney's intention to create, in the jurors' minds, the impression that Terenzi had implicated Tufano. This was obviously improper.

*Id.*

■ The testimony of Fuhr in the present case similarly violated the rules against hearsay and violated Mason's right of confrontation. The fact that the content of Rivera's statement to Fuhr was not revealed in detail was immaterial, for the plain implication that the prosecutor sought to elicit, and emphasized in his summation, was that the conversation with Rivera led the police to focus on Mason.

The State urges that we reach the opposite conclusion, relying on the Fifth Circuit's decision in *Foy v. Donnelly,* 959 F.2d 1307 (5th Cir.1992), which rejected a Confrontation Clause claim based on a prosecutor's questions focusing on a confession whose content was not disclosed. There the prosecutor, after first eliciting from one officer the fact that Foy's codefendant Shelbia had given a confession, asked whether the officer had prepared a warrant for Foy's arrest "subsequent to your investigation and after your taking of this particular statement." *Id.* at 1311. The circumstances of *Foy,* however, were starkly different from those at issue here. In *Foy,* another officer, Gerretts, had testified that during the robbery of one of the stores in question, he observed Foy waiting in a car near the store; he then saw Foy flash his lights and drive directly opposite

the door to the store and stop. Gerretts watched the robber emerge from the store and get into the car, and saw the car speed away. Gerretts gave chase and continued to follow by car when Foy left his car and began to run. Foy then ran into a fence, Gerretts left his car, and for approximately one minute Gerretts had Foy cornered. Foy, however, managed to escape. Gerretts testified that during part of the time Foy was cornered, Gerretts viewed Foy's face. He "positively identified Foy at trial." *Id.* at 1309 n. 2. Further, when Foy hit the fence, he dropped his gun, which Gerretts retrieved. The gun was found to be registered to the father of Foy.

The *Foy* court found no Confrontation Clause violation in the prosecutor's asking whether a warrant for Foy's arrest had been prepared after Shelbia's confession because the content of "Shelbia's confession was not disclosed [so] that it clearly implicated Foy or directly alluded to him," *id.* at 1313, and because there was so much other evidence connecting Foy to the crime that there was no necessary inference that Shelbia's statement had implicated Foy:

> The testimony concerning the officer's investigation, when considered together with the application for an arrest warrant, permitted the jury to connect what Officer Gerretts found from his own detective work—rather than Shelbia's statement—with the arrest warrant application. Because of the sequence in which the officer's testimony was developed, there were myriad reasons why Shelbia's statement could be thought to have pertained to his participation alone, and yet when coupled with Officer Gerretts' investigation of Foy and Shelbia, to have served as a basis to arrest Foy.

*Id.* We see no similarity between the *Foy* case and this one. Here, there was no police work that turned up Mason, and the only lead to him obviously came from Fuhr's conversation with Rivera.

■ We also reject the State's contention that even if admission of the Fuhr testimony violated Mason's confrontation rights his trial counsel's failure to object to it did not fall below professional standards of competence.

The *Bruton* principle had long been established, and the *Tufano* court, nearly a decade before Mason was tried, had called the prosecutorial attempt to create an impression that a codefendant's unreported statement had led to the defendant's arrest an impropriety that was "obvious[ ]." Notwithstanding the obviousness of the impropriety, trial counsel failed to object when the prosecutor first sought to elicit the testimony; failed to seek to have the testimony stricken; failed to object when the prosecutor argued the implication in summation; and failed to object to having that part of the Fuhr testimony read back to the jury. There can be no suggestion that these failures were tactical. Though trial counsel at one time claimed that there was a tactical explanation for his failure to attempt impeachment of Taylor with the police report, he never offered any explanation whatever for his failure to object at any of the three crucial junctures to Fuhr's implication that Rivera had named Mason. We agree with the district court that counsel's performance fell below the constitutional standard.

### B. *Prejudice*

■ We also reject the State's contention that Mason failed to meet the second part of the *Strickland* test, that is, that but for counsel's deficient performance, the likely outcome of the trial would have been different. In addressing this question, we take into consideration such factors as:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Harper v. Kelly,* 916 F.2d 54, 57 (2d Cir.1990) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991); *see also Tinsley v. Kuhlmann,* 973 F.2d 163, 166 (2d Cir.1992), *cert. denied,* ─── U.S. ───, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993).

Evaluating these factors, we agree with the district court that absent Fuhr's implication that Rivera had accused Mason, the outcome of the trial would likely have been different. The State's evidence against Mason was certainly not overpowering. There was no physical evidence, such as fingerprints, against him. None of the three eyewitnesses who testified could specify any distinguishing characteristic that would have permitted them to identify Mason. Two of those witnesses had not identified him prior to trial and did so only at trial when he was the obvious choice, being the only black male at the counsel table. The third eyewitness, Taylor, who claimed to have had a face-to-face conversation with Mason for up to 15 minutes, apparently took some three minutes to pick him out in a six-man pretrial lineup. And Taylor's account of the robbery was at odds with the account described in the police report.

Thus, as is revealed both by the prosecutor's questioning of Fuhr and by his summation, the State plainly felt it needed to provide the jury with an indication as to how it had come to focus on Mason. That connection was provided only by Fuhr's testimony that after conversing with Rivera, he was looking for Mason. The critical role of that testimony is confirmed by the facts that the only evidence the jury asked to review was the testimony of Taylor and the testimony of "Fuhr, relating to the apprehension of [Mason]."

Finally, the jury itself found the case against Mason close. First, as indicated, it felt compelled to ask for a rereading of the testimony as to how the police came to focus on Mason. Further, even after having that testimony and the Taylor account of the robbery read back, the jury reported that it was hopelessly undecided. It was only after receiving an *Allen* charge that the jury was able to reach a verdict.

In all the circumstances, we conclude that trial counsel's failures to protect Mason's right of confrontation were such as to undermine our confidence in the outcome of the case absent those failures. Accordingly, we uphold the district court's granting of the writ.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

We note that Mason has moved for release on bail pending retrial in state court. We instruct that this motion be redirected to the district court, which is hereby authorized to decide it without awaiting the issuance of the mandate.